UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                        ) | Cr. No. 1:15-CR-123-JL |
| ) | |
| DAVID ACKELL                   ) | |

### UNITED STATES' OBJECTION
### TO DEFENDANT'S MOTION TO DISMISS

The United States of America, by and through its attorney, Emily Gray Rice, United States Attorney for the District of New Hampshire, objects to the defendant's motion to dismiss. In support of this objection, the United States states as follows:

### INTRODUCTION

The defendant was originally indicted on July 29, 2015 on one charge of stalking in violation of 18 U.S.C. § 2261A(2)(B). On July 7, 2016, the defendant filed a motion to dismiss, alleging that the government's indictment failed to state an offense; that 18 U.S.C. § 2261A(2)(B) is facially overbroad in violation of the First Amendment; and that the statute is unduly vague in violation of the First and Fifth Amendments. On July 27, 2016, a federal grand jury returned a superseding indictment, again charging the defendant with one count of stalking in violation of 18 U.S.C. § 2261A(2)(B).

### FACTUAL BACKGROUND

On April 18, 2014, the police met with and interviewed R.R., then 18-years-old and her parents. R.R. was subsequently re-interviewed by the FBI on July 25, 2014. The interviews were consistent and relayed the following:

When R.R. was 16 years old, she created an account on a social media site. When she opened the account, she certified that she was 18-years-old, even though on her profile she wrote that she was 16 years old. R.R. also posted fully clothed pictures of herself. Approximately 4 to 6 months after opening the account, R.R. received a private message from a male who claimed to be a 21-year-old pilot. The individual identified himself as David Ackell and his user page had a photograph of an airplane.

As a result of R.R.'s questioning, Ackell soon admitted that he was actually 38-years-old. R.R. reiterated that she was 16 years old and it was strange for a 38-year-old man to want to speak to her since she was only 16. After a brief respite in communication, Ackell assured R.R. that they were just talking and it was acceptable for them to communicate.

Ackell began asking R.R. to send pictures of herself via another site called KIK. After sending him pictures of herself clothed, Ackell encouraged R.R. to send more revealing photos. R.R. began sending Ackell photos of herself in her underwear at his request.

At one point prior to R.R.'s 18th birthday, Ackell offered to send R.R. money in exchange for revealing photographs of her. R.R. agreed and provided Ackell with her P.O. Box in Hancock, New Hampshire, however no money was ever sent. When R.R. was 17-years-old, Ackell offered to drive up from Massachusetts to her school to give her money in person. R.R. declined and stated that she did not want to meet him.

R.R. and Ackell communicated via KIK, Snapchat, texting, and phone calls, with cell phones being the primary means of correspondence. The discussions were sexual in nature. Ackell engaged R.R. in discussions regarding sexual acts involving domination, handcuffs and bondage scenarios. Ackell would tell R.R. that he was masturbating while they were communicating.

After R.R. turned 18, Ackell began asking for photographs more regularly.  R.R. stated that the conversations became more sexually graphic. During one exchange when R.R. stated that she was uncomfortable and did not want to continue to send photos of herself or speak in a sexual manner, Ackell replied that she was his "slave."

Ackell told R.R. that she had to continue to send him more pictures and do exactly what he said to do or he would send the pictures she had already provided to her entire "friends" list on her Instagram account.  Ackell then sent R.R. a photo of his computer screen which displayed a photo of R.R. in her underwear, which she recognized as a photo she had sent to him.

R.R. was upset as Ackell had always told her that her wouldn't save any of her pictures and that he had deleted them.  R.R. estimated that by the time Ackell called her "slave" she had sent him approximately 300 photographs of herself in her underwear or partially nude.  Ackell told R.R. that he had saved every photograph she had sent and that if she did not do as he said, he would post all of the photographs to her contacts.[1]   R.R. begged Ackell not to send the pictures to anyone, and to delete them to which he replied, "You're my slave."

R.R., fearful that Ackell would send out the photographs to her family and friends, and fearful that her future would be ruined, agreed to do what Ackell asked if he didn't post her photos. After that, Ackell R.R. messages saying "Pics now" which R.R. knew required her to send him photographs of herself.  Ackell continued to call R.R. "slave" and demanded that she call him, "Owner."  In his demands for pictures of R.R., he would command that she pose in certain ways such as "open legs," and "show boobs."  When making these demands, Ackell continued to threaten R.R. to send the photos to everyone if she did not comply.

---

[1]   R.R. had previously given Ackell her Instagram account information so he had access to her list of contacts.

In late 2013 in to 2014, R.R. began dating Daniel Hendrick, a person close to her own age. R.R. at first did not tell Hendrick anything about Ackell but did tell Ackell that she had a boyfriend and wanted Ackell to leave her alone. Ackell continued his threats to post R.R.'s photos if she attempted to stop communication with him. R.R. told Ackell that the situation was making her depressed and suicidal but he refused to leave her alone and demanded more photos.

R.R. then decided to confide in Hendrick what was happening. R.R. gave Hendrick Ackell's telephone number. Hendrick called Ackell and told him to stop harassing his girlfriend. R.R. then received an angry text from Ackell, demanding that she call him. R.R. refused and Ackell told her via electronic communication that he had recorded the conversation with Hendrick because he (Ackell) was a federal agent and planned on having Hendrick arrested for threatening him. R.R. begged Ackell not to have Hendrick arrested.

After the telephone call made by Hendrick, Ackell continued to threaten to distribute R.R.'s photographs and further threatened to have Hendrick arrested and charged with a felony if she did not continue to send him photos and obey his commands. Ackell did make R.R. an offer to end the communication: Ackell stated that if R.R. would continue to be his "slave" through February 2014, he would leave her alone and delete her photos. R.R. reluctantly agreed.

Sometime after January 10, 2014, R.R. was with Hendrick and two other friends traveling by car to pick up a friend. R.R. saw Ackell's number calling Hendrick's phone. Hendrick answered the call and became quite angry. After the conversation, Ackell sent numerous photographs of R.R. to Hendrick's phone. R.R. deleted the photographs and Ackell's number from Hendrick's phone. She then contacted Ackell, asked him to stop sending her pictures to her friends, and agreed to remain Ackell's slave until February 26, 2014. R.R. then attempted to change her Instagram account to a private setting and blocked Ackell from her Snapchat and

KIK accounts. However, Ackell was still able to contact her and continued to harass her. Ackell chastised her for having blocked him and reminded her that she was obligated to remain his slave until February of 2014.

During this time Ackell also told R.R. he had "sold" her to a new owner. Ackell explained that he had given all of R.R.'s information and photographs to this new owner who was more intense than he had been. Ackell stated that he did this to teach her a lesson, but if she did what he said, he would by her back. Later he told R.R. during a phone call that he had bought her back and now she was further indebted to him (Ackell). R.R. advised that Ackell began calling her a "butterfly" that he had caged, and requiring her to message him when she went to bed with "goodnight owner, I love you."

In February 2014, Ackell informed R.R. she would no longer need to be his slave; this changed though, when Ackell told her she was not complying with his demands. Ackell demanded she send him videos of her masturbating. Ackell threatened to "sell her" to another internet user, and later told R.R. he had sold her, but bought her back for $176.00, further indebting her to him. At this point, Ackell told R.R. he would set her free if she helped him "cage" another young girl.

R.R. tried numerous tactics to remove Ackell from her life, including sending him links to Match.com in hopes he would find adult women to be interested in. Ackell sent photos of a girl purported to be 14-years-old whom Ackell said he would take in R.R.'s stead. Ackell told R.R. he would delete her photos if she listened (via telephone) to Ackell sexually assaulting the young girl. Ackell taunted R.R., saying she would be responsible for Ackell "caging" the 14-year-old girl. R.R. decided she did not want that to happen to this young girl, and therefore agreed to remain Ackell's slave.

R.R. then posted a summary of her story regarding Ackell, without mentioning names on Facebook, warning others about the dangers of on-line encounters. R.R.'s father saw the posting and confronted R.R. about it. R.R. then told him what had been transpiring. At her father's instruction, R.R. told Ackell that she had told her family about his harassment of her and that they would be contacting law enforcement. R.R. took screen shots of her communications with Ackell that were still present on her phone.[2] R.R. then deleted all her accounts in which she had had communication with Ackell. R.R. texted Ackell that her father knew what was going on and, if he did not cease contacting her, criminal charges would be brought. Ackell tried to contact R.R., but she did not respond. At that point, R.R. and her father went to the police.

## ARGUMENT

### I.   The Government's Indictment Adequately States an Offense.

One July 29, 2015, a grand jury indictment charged the defendant with interstate stalking in violation of 18 U.S.C. § 2261(A)(2)(B). On July 27, 2016, a grand jury returned a Superseding Indictment which alleges that from on or about October 2012 to on or about February 2014, in the District of New Hampshire, and elsewhere, the defendant,

> with the intent to injure, harass, intimidate, and to place under surveillance with the intent to injure, harass and intimidate another person, namely, R.R., used facilities of interstate and foreign commerce, including electronic cellular telephone networks, to engage in a course of conduct, to wit, the sending of text messages, digital images and other electronic communications to R.R. and another, that caused, attempted to cause, or would be reasonably expected to cause, substantial emotional distress to R.R.
>
> All in violation of Title 18, United States Code, §2261A (2)(B).[3]

---

[2]   The remaining screen shots corroborate R.R.'s account to law enforcement.
[3]   The superseding indictment differs from the original indictment in that it includes the language defining the course of conduct as the "the sending of text messages, digital images and

6

The defendant filed his motion to dismiss two days before the current superseding indictment was returned on July 27, 2016.

An indictment is sufficient if it: 1) contains the elements of the offense charged; 2) fairly informs the defendant of the charges against which he must defend and; 3) enables him to enter a plea without fear of double jeopardy. United States v. Yefsky, 994 F.2d 885, 893 (1st Cir. 1993); Hamling v. United States, 418 U.S. 87, 117 (1974). "Setting forth the words of the statute is 'generally sufficient' if 'those words set forth all the elements of the offense without any uncertainty or ambiguity.'" United States v. Berk, 652 F.3d 132, 138 (1st Cir. 2011) (quoting United States v. Brown, 295 F.3d 152, 154 (1st Cir. 2002)). Rule 7 of the Federal Rules of Criminal Procedure states that an indictment must be a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1); see also United States v. Buckley, 689 F.2d 893, 899 n.5 (9th Cir. 1982) (courts have construed the language of Fed. R. Crim. P. 7(C) to require little more than that the indictment give defendants sufficient notice of the crime). An indictment will satisfy these requirements when it informs the defendant of the statute under which he is charged; lists the elements of the violation; and specifies the time period during the violation occurred. United States v. Urban, 404 F.3d 754, 771 (3d Cir.2005).  Ultimately, the test for sufficiency is not whether an indictment "could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." United States v. Awad, 551 F.3d 930, 935 (9th Cir. 2009).

The indictment in this case details the elements of interstate stalking by adhering to the statutory language and specifies facts sufficient for the defendant to know the conduct with

---

other electronic communications to R.R. and another" and includes the language "attempted to cause."

7

which he is charged. The indictment specifies the time period of the defendant's alleged stalking behavior (October 2012 to February 2014); where the stalking took place (the District of New Hampshire); who the victim was (R.R.); the facilities of interstate commerce the defendant used (electronic cellular telephone networks); and the conduct the defendant engaged in (the sending of text messages, digital images and other electronic communications that caused, attempted to cause or would be reasonably expected to cause substantial emotional distress to the victim, R.R). The government's indictment plainly and sufficiently alleges all of the elements necessary to charge a violation of § 2261(A)(2), and provides facts sufficient for the defendant to prepare for and meet the charge against him. Nothing else is required.

**lI.     The Interstate Stalking Statute is Not Unconstitutionally Overbroad on Its Face.**

The defendant next contends that this Court should dismiss the stalking charge against him because the statute under which he is charged, 18 U.S.C. § 2261A(2), is facially overbroad under the First Amendment. The defendant acknowledges, as he must, that several courts of appeals, including the First Circuit, have previously rejected such arguments.[4] The defendant asserts that these cases do not control because Congress amended the statute in 2013 in ways which the defendant believes cause new First Amendment problems.

Noting that no court has yet ruled on the constitutionality of § 2261(A)(2)(B) after the 2013 amendment, the defendant spends his memorandum exploring blogosphere criticism of the amended statute by some First Amendment commentators. But, as is typically so, the answer lies, not on the blogs, but in the United States Reports and the Federal Reporter. Statutes such as § 2261A (2), which require that the defendant intentionally engage in conduct designed to harass

---

[4]     See United States v. Sayer, 748 F.3d 425(1st Cir. 2014); United States v. Osinger, 753 F.3d 939, (9th Cir. 2014); United States v. Petrovik, 701 F.3d 843 (8th Cir. 2012); United States v. Bowker, 372 F.3d 365 (6th Cir. 2004).

or intimidate others does not cause First Amendment concern because the First Amendment does not protect this type of intentional conduct meant to cause injury to another.

The current version of § 2261A (2) makes it a crime to engage in a "course of conduct" using the mail or internet with "the intent to kill injure, harass [or] intimidate" so long as the course of conduct "causes, attempts to cause, or would reasonably be expected to cause substantial emotional distress" to the victim. The changes to the statute from the 2006 version are as follows: (1) "intimidate" was added after "harass" and (2) "reasonably expected to cause" was added before "emotional distress."

The statute essentially has three components. First, the defendant must engage in a "course of conduct" using the mails or the internet. A course of conduct is "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2262(2). Second, the defendant must engage in this course of conduct with the intent to kill, injure, harass or intimidate. And finally, the course of conduct undertaken with the necessary intent must cause, attempt to cause or be reasonably expected to cause substantial emotional distress.

Relying on his favorite internet commentators, the defendant takes First Amendment issue with the second and third parts of the statute. Specifically, he says that there are many ways protected by the First Amendment in which a person may use the mails or internet to harass or intimidate another person. Second, he claims that the First Amendment does not allow a statute to impose criminal liability unless the harassing or intimidating conduct engaged in by the defendant actually causes harm to the victim. Thus, he suggests the statute goes astray by permitting liability where the intentionally harassing or intimidating conduct did not in fact cause the victims to suffer substantial emotional distress but rather only "would be reasonably expected to cause" substantial emotional distress. These arguments fail.

The defendant has not brought an as-applied challenge to claim that § 2261A(2) cannot be constitutionally applied to him. Rather, he invokes the overbreadth doctrine to argue that the First Amendment chill worked by the statute is so great that it cannot be applied to anyone, including those whose conduct (like his) is certainly unprotected by the First Amendment.

Overbreadth is an exception to the usual rule that "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to other situations not before the Court." New York v. Ferber, 458 U.S. 747, 767 (1982). The doctrine, applicable only in the First Amendment context, provides that a law is facially invalid "if a substantial number of its applications are unconstitutional judged in relation to the statute's plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 473 (2010). It is not enough to merely provide examples of unconstitutional application of the statute; rather the party asserting overbreadth must show that these examples are substantial in relation to the legitimate applications of the law. Expressions Hair Design v. Scheiderman, 808 F.3d 118, 138 (2d Cir. 2015). The overbreadth doctrine is "strong medicine that should be employed with hesitation, and then only as a last resort." Nat'l Organ. For Marriage v. McKee, 649 F.3d 34, 52 (1st Cir. 2011).

There is no question that the conduct made criminal by § 2261A will often be carried out by language but this is not the dispositive factor for triggering the First Amendment. "It has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was initiated, evidence or carried out by means of language, either, spoke, written or printed." Giboney v. Empire Storage & Ice Co. 336 U.S. 490, 502 (1949). Thus, speech integral to criminal conduct is a long-recognized category of unprotected speech. Sayer, 748 F.3d at 434.

10

The Supreme Court has recognized that statutes which are targeted at communication intended to injure others may be enforced consistent with First Amendment.  Thus, in <u>Virginia v. Black</u>, 538 U.S. 343, 359-60 (2003), the Supreme Court held that a statute which made it illegal to burn a cross with the intent to intimidate another person was constitutional because it required a showing that the defendant acted with the intent to injure.  As Justice Alito explained in <u>Elonis v. United States</u>, 135 S. Ct. 2001, 2016 (2105) (Alito, J.), (concurring in part and dissenting in part), there is good reason for this rule: "Threats inflict great harm and have little if any social value.  A threat may cause serious emotional stress for the person threatened and those who care about the person.  It is true that a communication containing a threat may include other statements that have value and are entitled to protection.  But that does not justify the constitutional protection of the threat itself."

Thus, the key in determining whether a statute targeting threatening communications can be constitutionally applied is whether the statute requires that the defendant act with a mental state evincing an intent to harm another person.  <u>United States v. Cassel</u>, 408 F.3d 622, 631-32 (9th Cir. 2005).  Section 2261A requires such an intent by demanding that the defendant act with "the intent to kill, injure, harass or intimidate."  As the First Circuit explained in rejecting a First Amendment challenge to the 2006 version of § 2261A, "the interstate stalking statute clearly targets conduct performed with serious criminal intent, not just speech that happens to cause of annoyance or insult." <u>Sayer</u>, 748 F.3d at 435.

The only change to the mens reas portion of § 2261A was to add "intimidate" to the list of intentional actions that trigger liability.  But it is well-established that a statute which makes it criminal to intentionally intimidate another person may be enforced consistent with the First Amendment. <u>Black</u>, 538 at 359-60; <u>Cassel</u>, 408 F.3d at 631.  This is so because to intimidate

means to place another in fear of injury -- precisely the sort of conduct that is not protected by the First Amendment.  Cassel, 408 F.3d at 636.[5]

Understanding "intimidate" and "harass" to mean communications that cause injury to another defeats the defendant's suggestion that the statute is overbroad because it could capture sharp business negotiations.  Calling such conduct intimidation or harassment as those words are used in § 2261A is a leap too far.  As the First Circuit recognized in Sayer, words in statutes should be interpreted in light of the words with which they are associated.  748 F.3d at 435.  In § 2261A, harass and intimidate are associated with kill and injure, demonstrating the type of "serious criminal intent" that is required for conviction under this law.  Id.  The defendant's suggestion that harassment under this statute would include "tweets critical of a large corporation accused of wrongdoing" is simply not the kind of intentional conduct meant to cause the substantial injury that the statute encompasses.

The defendant also says that there could be situations in which the statute would capture political speech such as when someone communicates harsh criticism directed to a public official that the official does not want to hear.  Assuming that such criticism could ever be within the scope of the statute (a questionable proposition for the reasons just discussed), it is possible that this sort of communication could be constitutionally immune from prosecution as stalking because it relates to matters of public concern. Cf., Snyder v. Phelps, 562 U.S. 443 (2011) (intentional infliction of emotional distress claim barred by First Amendment when claim based on speech related to matter of public concern).

---

[5] The kind of injury caused need not be physical in nature in order for a defendant's action to constitute criminal intimidation.  The statute here captures threats of physical injury as well as substantial emotional injury.  Cassel, 408 F.3d at 636.

This was the point of United States v. Cassidy, 814 F. Supp. 2d 574, 586 (D. Md. 2011), which concluded that § 2261A could not be constitutionally applied to anonymous blog/twitter criticism of a religious figure because the speech at issue was about religion and a public figure. In support of this ruling, the Cassidy court cited New York Times v. Sullivan, 376 U.S. 254, 271 (1964), which held that the First Amendment places substantial limitations on defamation actions brought by public officials because the need to protect the victim from defamatory speech needs to yield to the need to permit the free flow of speech pertaining to public figures and matters of public concern. But this concern about protecting the flow of speech concerning public figures and matters of public concern did not lead the Supreme Court to eliminate all defamation actions because of the First Amendment. Rather, even after New York Times, defamation actions involving private figures about matters of private concern continue to proceed without First Amendment limitation. E.g., Snead v. Redland Aggregates Ltd., 998 F.2d 1325, 1334 (5th Cir. 1993).

Most stalking cases, like this one, involve targeted contact between private individuals about matter of private concern, such as residual bitterness over failed romantic relationships. E.g., Sayer, 748 F.3d at 428 (stalking following romantic breakup); Petrovic, 701 F.3d at 852-53 (8th Cir. (stalking following divorce); United States v. Osinger, 753 F.3d 939, 941 (9th Cir. 2014)(stalking former girlfriend); United Shrader, 675 F.3d 300 (4th Cir. 2012) (stalking former girlfriend and girlfriend's husband); United States v. Conlan, 786 F.3d 380, 384 (5th Cir. 2015)(stalking of girlfriend and girlfriend's husband); United States v. Walker, 665 F.3d 212, 221 (1st Cir. 2011)(stalking of separate spouse). Certainly, prosecutions like Cassidy and the ones hypothesized by the defendant in the memorandum are the rare exception, not the rule, when examining the actual application of §2261A.

Because the usual case prosecuted under § 2261A is an attempt to harass or intimidate arising out of a private relationship about private matters, there is no First Amendment problem, even if the intimidation is done through a means of communication. Outlier cases such as Cassidy or the defendant's far-fetched hypotheticals can and should be dealt with through as applied litigation as was done in Cassidy. But the important point for present purposes is that the defendant has not shown that there are a substantial number of applications of § 2261A that are unconstitutional judged in relation to the statute's plainly legitimate sweep of criminalizing communications between private people about private matters that are meant to harass or intimidate.

In addition to the inclusion of intimidate as one of the intentional acts criminalized under § 2261A, the defendant also complains that the statute can be violated where there is no actual injury so long as the defendant's intentional conduct "would be reasonably expected to cause substantial emotional distress." The defendant argues that this caused a First Amendment problem because it would allow a conviction absent proof of harm or even that the intended recipient saw the communications underlying the prosecution.

The premise of this argument is wrong: "The proper focus is on the defendant's conduct . . . not the subjective emotions which the victim experiences." Cassel, 408 F.3d at 636; United States v. Meeker, 527 F.2d 12, 16 (9th Cir. 1975) ("Nor is proof that the victim was in fact frightened for his own physical safety in order to find that a defendant performed the criminal act of intimidation"). As already discussed, the important aspect of the statute allowing prosecution consistent with the First Amendment is that the defendant acts intentionally to harass or intimidate the victim. Whether the defendant succeeds in actually causing harm is beside the point for constitutional purposes.

In sum, § 2261A criminalizes conduct (even if communicative conduct) that is undertaken to intentionally cause injury (either physical or emotional injury to another person). Even assuming that engaging in such conduct is constitutionally protected when done to a public figure or in conjunction with a matter of public concern, those cases are the rare exception. The usual case under § 2261A is a jilted former lover using the internet to harass or intimidate his or her former partner. Such communications are unprotected by the First Amendment. Because the legitimate sweep of the statute is broad and the defendant's examples of possible unconstitutional applications are narrow (he has cited one case), the defendant's overbreadth challenge fails. The appropriate way to police the boundaries of § 2261A is the usual form of constitutional adjudication – the as applied challenge. For these reasons, this Court should reject the overbreadth challenge brought by the defendant against his prosecution.

### III. The Interstate Stalking Statute is Not Void for Vagueness.

The defendant's final argument is that § 2261A is unconstitutionally vague because it fails to provide clear warning of the conduct that is criminalized. In particular, the defendant says that the statute is vague because a person cannot know in advance whether his conduct is the type of conduct that can be reasonably expected to cause substantial emotional distress to another person.

A statute is void for vagueness only where (1) it fails "to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or (2) it authorizes or encourages "arbitrary and discriminatory enforcement." City of Chicago v. Morales, 527 U.S. 41, 56 (1999). A statute need not define the offense with "mathematical certainty." Grayned v. City of Rockford, 408 U.S. 104, 110 (1972). "[T]o be constitutional, criminal statutes need only give 'fair warning' that certain conduct is prohibited." San Filippo v. Bongiovanni, 961 F.2d

15

1125, 1136 (3d Cir.1992) (citing Colten v. Kentucky, 407 U.S. 104, 110 (1972)). While it is true that, in the First Amendment context, a more stringent vagueness test applies "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." United States v. Williams, 553 U.S. 285, 304 (2008).

Even where a crime involves communicative conduct, a defendant cannot succeed on a vagueness argument by complaining about the vagueness of the law as applied to the conduct of others as long as his conduct is clearly proscribed under the statute. Holder v. Humanitarian Law Project, 561 U.S. 1, 19 (2010) (stating that "even to the extent a heightened vagueness standard applies, [a party] whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others.").[6]

Based on Holder, the defendant's motion to dismiss on vagueness grounds is premature. Holder, as just mentioned, prevents a successful vagueness challenges where a defendant's own communicative conduct is conduct that is outside the protection of the First Amendment. Here, the government has presented a sufficient indictment and has outlined above facts that it intends to prove at trial. These facts, if proven, are within the heartland of the statute and sketch a pattern of intentionally harassing and intimidating conduct that is not within the ambit of the First Amendment. See supra. Indeed, the defendant does not claim otherwise as he has studiously avoided challenging his prosecution on as-applied First Amendment grounds. Thus, because the defendant does not claim here that vagueness of the statute interfered with his own

---

[6] The way to bring a claim based on the speech of others is an overbreadth claim under the First Amendment not vagueness. Holder, 561 U.S. at 19. The defendant has brought such a claim for the

exercise of protected First Amendment rights, he cannot bring a facial vagueness challenge to § 2261A.

There is no way in federal criminal practice to determine pre-trial whether the government's facts will pan out at trial in the way the government expects. But, in order to evaluate the defendant's vagueness argument, the court will need to know the facts. United States v. Conlan, 786 F.3d 380, 386 (5th Cir. 2015). Therefore, courts have held that vagueness challenges to statutes are premature when made by way of a pretrial motion to dismiss because of the need for fact-finding to resolve the claim. E.g., United States v. Ferguson, 142 F. Supp. 2d 1350, (S.D. Fla.2000); United States v. Gotti, 2004 WL 32858, at *6 (S.D.N.Y. Jan. 6, 2004).

In any event, even if ripe, the defendant's vagueness argument fails. Numerous courts have held that the words "intimidate" or "harass" as used in § 2261A are not unconstitutionally vague because these are commonplace terms. And, moreover, the statute requires the jury to find that the defendant intentionally acted to intimidate or harass which narrows the reach of the law and limits the chance of arbitrary enforcement. Conlan, 786 F.3d 380, 385 n.1 (5th Cir. 2015) (citing the multiple circuits that have rejected vagueness challenges to § 2261A).

The defendant seems to suggest that because the numerous cases cited in Conlan involved the pre-2013 version of the statute, the analysis should be different now. To make this argument, the defendant focuses on the requirement, added in 2013, that the defendant's conduct "be reasonably expected to cause substantial emotional distress" to the victim or his or her family. "Substantial emotional distress" is not an "esoteric or complicated term[] devoid of common understanding." Ossinger, 753 F.3d at 945; Veile v. Martinson, 258 F.3d 1180, 1189 (10th Cir. 2001). Thus, the defendant's complaint cannot be that "substantial emotional distress" is a vague standard but rather that the law is vague because he cannot know in advance whether

his conduct will meet the standard necessary for conviction. This is so because a jury will have to decide, after the fact, whether the defendant's intentionally harassing or intimidating conduct would be "reasonably expected to cause substantial emotional distress."

The defendant's argument fails because statutes that create standards that juries must apply to real world facts do not create vagueness problems. As the Supreme Court recently explained there is no vagueness problem caused by "laws that call for the application of a qualitative standard . . . to real world conduct." Johnson v. United States, 135 S. Ct. 2551, 2561 (2015). This so because the law "is full of instances where a man's fate depends on his estimating rightly some matter or degree." Id.

This is precisely the situation here. Under § 2261A, a jury is charged with applying a qualitative standard-- "reasonably expected to cause substantial emotional distress" -- to real-works facts proven at a trial beyond a reasonable doubt. As Johnson makes clear, statutes structured in this way do not create a vagueness problem, even though a defendant obviously cannot know in advance how a jury will apply the standard to his particular conduct.

In sum, the defendant's vagueness challenge is premature. But in any event it fails on the merits. The statute is sufficiently clear to provide notice and to limit arbitrary enforcement. Accordingly, this Court should reject the defendant's motion to dismiss on vagueness grounds.

## CONCLUSION

For the reasons stated above, this Court should deny the defendant's motion to dismiss.

          Respectfully submitted,

          EMILY RICE
          United States Attorney

Date:  August 10, 2016

By: /s/  Helen White Fitzgibbon
Helen White Fitzgibbon
N.H. Bar No. 6833
Assistant U.S. Attorney
53 Pleasant St., 4th Floor
Concord, NH 03301
603-225-1552
helen.fitzgibbon@usdoj.gov

/s/  Seth R. Aframe
Seth R. Aframe
M.A. Bar No. 643288
Assistant U.S. Attorney
53 Pleasant St., 4th Floor
Concord, NH 03301
603-225-1552
seth.aframe@usdoj.gov

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of this pleading has been served this day, via ECF, on William E. Christie, counsel for the defense, 107 Storrs Street/P.O. Box 2703, Concord, NH 03302.

          /s/  Helen White Fitzgibbon
          Helen White Fitzgibbon
          Assistant U.S. Attorney