UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

United States

v.                                    Civil No. 15-cr-123-01-JL
                                      Opinion No. 2017 DNH 133P
David Ackell


**MEMORANDUM ORDER**


After a four-day jury trial, defendant David Ackell was
convicted of one count of stalking in violation of 18 U.S.C.
§ 2261A(2)(B).  At the close of the prosecution's case, at the
conclusion of his own, and after his conviction, Ackell moved
for judgment of acquittal, see Fed. R. Crim. P. 29, arguing that
that the evidence did not support his conviction and that the
statute under which he was convicted is unconstitutional.  He
has also moved for a new trial, see id. Rule 33, asserting a
violation of his Sixth Amendment right to a public trial.

The court denies both motions.  Section 2261A(2)(B) is not
unconstitutional, either as applied to Ackell or as facially
overbroad or vague.  The evidence presented at trial would allow
a reasonable factfinder to conclude that Ackell violated it by
using facilities of interstate commerce to engage in a course of
conduct, with the intent to harass or intimidate the victim in
this case, R.R., and that course of conduct either caused or
reasonably would have been expected to cause substantial

emotional distress to R.R.  Finally, the court denies Ackell's motion for a new trial, concluding that the evidence does not preponderate heavily against the jury's verdict and that Ackell's Sixth Amendment right to a public trial was not violated because the courtroom was not closed to the public during his trial.

## I.  Background[1]

R.R. "met" Ackell online during her sophomore year of high school, when she was 16 years old.  Ackell claimed, during their first online conversations, to be 32 year old, though in fact he was over 40.  They communicated routinely -- perhaps four to seven times per week -- during that year.[2]

At that time, Ackell offered to send R.R. money in exchange for pictures of herself.  She ultimately did send him photographs that year -- including photographs of her wearing only her underwear -- though he never sent her money in

---

[1] The court "recite[s] the facts as the jury could have found them, viewing the evidence in the light most favorable to the jury verdict."  United States v. Rodríguez-Martinez, 778 F.3d 367, 369 (1st Cir. 2015).

[2] Ackell and R.R. never met in person.  They communicated through text messages and messaging applications such as Kik and Snapchat.  R.R. testified that she sent photographs to Ackell through Snapchat because she believed that pictures sent through that application are not saved and disappear after a short period of time.  The court uses the terms "spoke" and "conversation" to refer to these text-based communications, except where noted otherwise.

exchange.  R.R. also sent such pictures to other individuals, including her boyfriend and others, often strangers, that she encountered online.  She eventually ceased communication with Ackell for a short period of time because, she testified, she "was freaked out about the age difference" between them.[3]

R.R. resumed communicating with him at some point late in 2013.  Ackell asked her to join him in a dominant/submissive relationship, wherein he would be dominant and R.R. would be submissive.  Not knowing what that meant, R.R. consulted the Internet.  She learned that to be "submissive" meant that she "would have to do what he said, what he instructed," and that "he would be the boss."[4]  R.R. agreed to this arrangement. During its course, Ackell instructed R.R. to take and send him pictures of herself in certain poses and at certain times. Ackell also demanded photographs of R.R. in various states of dress, as well as sexually explicit photographs.[5]  She complied.

---

[3] Tr. Trans. Dec. 14 (doc. no. 84) at 16.

[4] Id. at 17-18.

[5] R.R. testified that some of these photographs depicted her without any clothing.  E.g., id. at 29-30, 100, 190-91.  Though she told the FBI that she had not sent Ackell any nude photographs, see Tr. Trans. Dec. 15 (doc. no. 83) at 144-45, a jury could conclude that she did in light of her testimony to that effect, her testimony that Ackell later sent some of those photographs to her then-boyfriend, Danny, id. at 37-38, 188, and Ackell's own text messages to her, Tr. Ex. 2 at 149 ("your nude pics were well after your noted birthday . . . .").

At the same time that R.R. was sending photographs to Ackell, she, again, also sent photographs of herself in varying stages of dress -- such as in yoga clothes, a bathing suit, or her bra and underwear -- to other people, including her then-boyfriend, Mike.[6]  She testified that she did so voluntarily, not in response to any demand on their part.  She further testified that she never sent nude photographs of herself to anyone except Ackell and Mike.

Eventually, R.R. informed Ackell that she was no longer comfortable with their relationship and asked to end it.  He responded that she was "caged" and "stuck."[7]  Though he had previously informed her on multiple occasions that he was not saving her photographs, Ackell disclosed that he had, in fact, done so, and that at least some of them were saved "on an encrypted server in Sweden, so if law enforcement came to search his house for anything, there would be no evidence."[8]  If R.R. stopped sending him photographs, Ackell threatened, he would send those he had saved to her family, friends from school, and all of her followers on Instagram.[9]  R.R. testified that this

_____

[6] Tr. Trans. Dec. 14 (doc. no. 84) at 29-30, 188.

[7] Id. at 24.

[8] Id. at 25-26.  See also Tr. Ex. 2 at 164.

[9] Id. at 24-25.  Instagram is a social media platform that allows users to post and share pictures and videos with anyone who

frightened her because dissemination of the photographs he possessed would humiliate her.

Toward the end of January 2014, R.R. told her new boyfriend, Danny Handrick, about Ackell's threats to disseminate her photographs. Hendrick called Ackell multiple times and threatened to assault and kill him.

On January 27, 2014, R.R. and Ackell spoke for four hours via text message.[10] R.R. repeatedly asked Ackell to delete her photographs and end the relationship. She expressed particular concern about her future and damage to her reputation, which may prevent her from gaining admission to a nursing program, if Ackell disseminated the photographs as threatened. Ackell, an airline pilot, falsely claimed to be a Federal Air Marshal and threatened to bring felony charges against Hendrick unless R.R. continued their relationship, including sending photographs upon Ackell's demand, until February 28. That text-message conversation ended around 3:00 a.m. the next morning, after R.R. finally agreed to Ackell's demands: she would remain in the

---

subscribes to that user's Instagram "feed" -- i.e., their "followers."

[10] R.R. testified that Trial Exhibit 2 portrays a series of screenshots that she took of this text-message conversation. Unless otherwise indicated, Ackell's and R.R.'s textual communications are transcribed here as they appear in Exhibits 1 and 2.

relationship until the end of February, and in exchange, Ackell would not bring charges against Hendrick.

The next evening, R.R. resumed the text-message conversation, telling Ackell that her mother had viewed their text messages and was upset. She testified that this was false -- that, though her mother had never seen those messages, R.R. told him this hoping to scare him and because she "wanted a few days of not needing to take pictures . . . of me for him or not letting him know where I am, what time I get up, what time I'm going to bed."[11]  Ackell concluded their text-message conversation, asking R.R. to "[p]lease delete this number."[12]

Two weeks later, on February 9, 2014, Ackell texted R.R., telling her to "[c]heck ur Kik please."[13]  R.R. testified that the screenshots in Trial Exhibit 1 portrayed messages exchanged between herself and Ackell through the Kik application, and that the Kik conversation occurred after that February 9, 2014 text message.[14]

---

[11] Tr. Trans. Dec. 14 (doc. no. 84) at 124.

[12] Tr. Ex. 2 at 190.

[13] Id.

[14] As discussed infra Part II.A.1, Ackell argues that the prosecution failed to prove that the text messages in Exhibit 2 preceded the Kik conversation in Exhibit 1.

During the Kik conversation, Ackell again demanded that R.R. send him photographs. He demanded, for example, that she send him pictures of herself exposed and touching herself, despite reluctant responses from her, such as, "I just dont feel well," "Im already all dressed tho," and "I feel uncomfortable."[15] When she informed him that she would no longer take photographs she felt uncomfortable about, texting, "And you know im not.gonna take any pictures like I did before, weve talked about it," he responded, "I'll trade you. Want that??? You are MINE. You will do as told."[16] Ackell several times threatened to "trade" R.R. to someone else if she did not comply with his demands, which she understood to mean that he would trade her photographs and information "to somebody else who would do what he was doing to [her]" through one of several online forums or websites where such "trades" occur.[17] He also repeatedly assured her that he was not saving the photographs. Despite these assurances, after the photographs were sent, Ackell asked R.R. to call him "to negotiate delet[ion]" of the photographs.[18]

---

[15] Tr. Ex. 1 at 92-97.

[16] Id. at 93.

[17] Tr. Trans. Dec. 14 (doc. no. 84) at 46-47.

[18] Tr. Ex. 1 at 98.

After the telephone call, Ackell confirmed that he would not "trade" R.R. The following exchange ensued:

Ackell:   I haven't traded you, have I?

R.R.:     No you have not and I thank you fot it

Ackell:   You did good tonight.  I know your mad.

R.R.      I'm not mad, I'm more just suicidal, and im mad at myself.

Ackell:   I understand.  Why are you so suicidal?  It doesn't release my desire for you.  So why?

R.R.      Because even tho im not caged[19] I still feel trapped and most of all really scared, beyond scared im terrified

Ackell:   But you know if your well behaved, I protect you.  Right?

R.R.:     I do and I'm trying but sometimes my anger can get the better of me and I think you know that

Ackell:   I do know that.  I'm working with you on that.  You are slowly being caged again.  I'm sorry. You know this.

R.R.:     Tonight im very determined to find you a new girl[.]  If you cared and loved me you wouldn't, you have me why would you cage me[.]  The nicer you are the more inclined I am to keep you as a friend, if I get caged I will be on suicide watch again I know me and I know I will

Ackell:   I understand.  I love you.  I don't have to be nice.  I can just trade you to find a nice girl. Understand??[20]

---

[19] R.R. testified that she understood, when he said she was "caged," that she was "stuck" in the relationship and could not escape.  See Tr. Trans. Dec. 14 (doc. no. 84) at 23-25, 45.

[20] Tr. Ex. 1 at 100, 102-104.

Following this exchange, Ackell sent R.R. pictures of other girls he might "cage."  She again sought assurances that, if he did so, he would delete her photographs.  Ackell would not agree to delete her photographs, however, unless she either had sex with him or procured another girl who would do so while R.R. was on the phone, so that R.R. would "know what [she] did to another girl."[21]

Ackell then suggested that he might "cage" a 14-year-old girl who was "very innocent."[22]  He detailed several acts he would have her perform, including having sex with Ackell while R.R. was on the phone and having sex with her dog, and explained that R.R. would be responsible for these things happening to the girl.  Ackell told R.R. that he would delete R.R.'s photographs after that girl had sex with him.  If she refused, Ackell said, "Your not deleted[.]  And it goes on.  If I have my choice, I have you forever and ever."[23]

After this exchange, and upon learning that Ackell might do to a 14-year-old girl what he had done and had threatened to do to her, R.R. finally spoke with her father about Ackell.  With her father's assistance, R.R. went to the police.  Before she

---

[21] Id. at 108.

[22] Id. at 110, 117.

[23] Id. at 116.

did so, however, and at her father's suggestion, R.R. took screenshots of some of her communications with Ackell and then deleted all of the messages she had exchanged with Ackell.

## II.  **Motion for judgment of acquittal**

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(1).  Ackell moves for judgment of acquittal, arguing that the prosecution failed to carry its burden at trial and that the statute is unconstitutional.  Concluding that the evidence presented at trial may sustain a conviction under 18 U.S.C. § 2261A(2)(B), that the statute is not overbroad on its face nor unconstitutionally applied to Ackell, and that Ackell has waived his undeveloped vagueness argument, the court denies his Rule 29 motion.

### A.  **Sufficiency of the evidence**

Ackell first argues that the evidence at trial was insufficient to prove two elements of the crime with which he was charged.  As the court instructed the jury:

> In order to sustain its burden of proof for the crime of stalking as charged in the indictment, the government must prove all of the following elements beyond a reasonable doubt:

> First, that the defendant used facilities of
> interstate and foreign commerce, including electronic
> cellular telephone networks.
>
> Second, that the defendant used the electronic
> communication service or other facility of interstate
> or foreign commerce to engage in a course of conduct
> consisting of the sending of text messages, digital
> images, and other electronic communications to R.R.
> and D. Hendrick.
>
> Third, that the defendant, while engaged in that
> course of conduct, acted with the intent to injure, or
> harass, or intimidate R.R.
>
> Fourth, that the course of conduct engaged in with the
> aforementioned intent caused substantial emotional
> distress to R.R., attempted to cause substantial
> emotional distress to R.R., or would be reasonably
> expected to cause substantial emotional distress to
> R.R.[24]

The parties stipulated to the first element.[25]  Ackell now argues

that the evidence presented by the prosecution at trial was

insufficient to prove the third and fourth elements -- intent

and causation of harm -- beyond a reasonable doubt.  The court

finds, to the contrary, that the evidence was sufficient to

convict.

---

[24] Jury Instructions (doc. no. 72) at 22.  The defendant objected
to instructions generally because, although believing them to be
"in conformance with the statute as enacted," he contends that
the "statute itself is constitutional under the First Amendment
both facially and as applied to" the defendant.  He did not,
however, propose any alternative instruction to cure this
alleged defect.  He also levelled no specific objection to this
instruction.

[25] See id. at 23.

In addressing such a motion, the court "examine[s] the evidence, both direct and circumstantial, in the light most favorable to the jury's verdict." United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009). It focuses not "on each piece of evidence separately," but rather "evaluate[s] the sum of all the evidence and inferences drawn therefrom, and determine[s] whether that sum is enough for any reasonable jury to find all the elements of the crime proven beyond a reasonable doubt, even if the individual pieces of evidence are not enough when viewed in isolation." United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir. 2015). The court must "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." Rodríguez-Martinez, 778 F.3d at 371 (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)). It may not, however, "assess the credibility of a witness in determining the sufficiency of the government's evidence." United States v. Rothrock, 806 F.2d 318, 320 (1st Cir. 1986) (citing Burks v. United States, 437 U.S. 1, 16 (1978)). After this analysis, "[t]he verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt." Santos-Soto, 799 F.3d at 57 (quoting United States v. Rodríguez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010)).

### 1.    Intent to harass or intimidate

The prosecution bears the burden of proving, beyond a reasonable doubt, that Ackell acted "with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person . . . ." 18 U.S.C. § 2261A(2). As the court instructed the jury:

> To act with "intent" means to act voluntarily and intelligently, not by ignorance, accident, or mistake, and with the specific intent or purpose of causing a desired result in a particular individual.  It is not enough merely to foresee that such a result is a likely consequence of repeated communications. Moreover, a bad motive of some other kind, standing alone, is not enough.[26]

Ackell argues that the prosecution failed to satisfy its burden as to this element.  He argues that the evidence demonstrated, to the contrary, that Ackell understood himself to be in a consensual, "dominant/submissive online relationship" with R.R., which he ended immediately upon her request, and that such an understanding precluded intent to injure, harass, or intimidate.[27]

---

[26] Jury Instructions (doc. no. 72) at 25.  The defendant offered no specific objection to this instruction.

[27] Defendant's Consolidated Mem. (doc. no. 79-1) at 8.  Ackell filed an identical, consolidated memorandum in support of both motions.  See document nos. 79-1 and 80-1.  For sake of convenience, the court cites to only one of them.

A jury may have found that Ackell held such a belief before January 27, 2014.[28]  R.R. testified that, at least for some period of time, she had agreed to engage in such a relationship with Ackell, though they may have had differing conceptions of what such a relationship entailed.  Specifically, R.R. understood that she had agreed to an arrangement wherein Ackell "would be the boss," and "would tell [her] to pose in a particular way and [she] would pose in that way," to take pictures for him.[29]

Ackell concedes, however, that this state of affairs changed on January 27, 2014.[30]  During that text-message conversation, R.R. informed Ackell that she was no longer interested in continuing their relationship.[31]  Several examples of messages R.R. sent to him that night highlight her desire to leave whatever arrangement that may have existed:

---

[28] The court notes here, as a preliminary matter, that it is accepting the defendant's argument on its own terms, that of a dominant/submissive fantasy relationship, and accepts, for purposes of this analysis, that a jury may conclude that Ackell and R.R. engaged in such a relationship for some period of time. But the jury need not have done so and rather could have accepted the text communications here at face value -- coercive, manipulative communications between a mature adult airline pilot and a teenage girl.

[29] Tr. Trans. Dec. 14 (doc. no. 84) at 18-19.

[30] Defendant's Consolidated Mem. (doc. no. 79-1) at 8-9.

[31] E.g., Tr. Trans. Dec. 14 (doc. no. 84) at 94-96; see also Tr. Ex. 2 at 141-44.

"Dont . . . talk to me."[32]

"Its over.  Get over it.  Move on and [t]alk to someone else.  It'll make everything easier.  Delete everything about me."[33]

"I just don't want this to continue on anymore that it has."[34]

"I can't be like I used to.  I don't want to.  I don't want to talk to you.  Can we please just drop everything and just go our separate ways?"[35]

"I want it all to stop.  I dont want you to be texting him or calling him or anything take down the felony charges.  And then as for me I have my whole life ahead of me so im asking please delete the pictures."[36]

"I really dont want to drag this on longer then it has.  I dint understand why you can't just drop everything and move on, seriously we have."[37]

"I'm not gonna be your slave again, I domt even want to talk to you."[38]

"I dont want anything to do with you anymore, ever again."[39]

---

[32] Tr. Ex. 2 at 119.

[33] Id.

[34] Id. at 120.

[35] Id. at 121.

[36] Id. at 122.

[37] Id. at 124.

[38] Id. at 132.

[39] Id. at 139.

R.R. also told Ackell that she deleted his contact information from her Kik account because she "[needed] everything to stop."[40] Even were this conversation the very first time that R.R. sought to leave the relationship, or the first time that Ackell understood that R.R. sought to leave, Ackell recognized these pleas as amounting to such a request during that text-message conversation: "You clearly stated today you didn't want me. First time. That's ok."[41]

During that conversation, R.R. also informed Ackell that she was not as interested in being "submissive" as she may have previously led him to believe. Ackell asked R.R. if her being a "[s]ubmissive [was] a lie as well?"[42] R.R. responded that she told him she liked being a submissive because she had "a tendency to tell people what they want to hear. You wanted to hear I like to be submissive, which is onky 25% true. Im being honest because I feel bad."[43]

A reasonable factfinder could infer, at this point -- after Ackell acknowledged that R.R. "didn't want" him and after R.R.

---

[40] Id. at 129.

[41] Id. at 141.

[42] Id. at 167.

[43] Id. See also Tr. Trans. Dec. 15 (doc. no. 83) at 92-93 (testifying that, through this text, R.R. told Ackell for the first time, that she "only liked being submissive about 25 percent of the time.").

admitted to leading Ackell on about her submissiveness -- that Ackell was on notice that any consensual dominant/submissive relationship between the two no longer existed. Despite those clear statements, Ackell continued to send text messages threatening to bring felony charges against R.R.'s boyfriend, Hendrick, and to retain R.R.'s photographs with the threat of possible dissemination unless she continued in their relationship through the end of February.[44] R.R. identified this offer as "black mail," and reiterated: "Forcing me to do something I don't want to do is a pretty shitty thing. I'm not going to your little slave again, im over that."[45]

As Ackell points out, the penultimate text messages in Exhibit 2 amount to a farewell from Ackell on the evening of January 28, 2014:

> Take care. Good bye [R.R]. Please delete this number. You said it's over and your mom is upset. You wont let me speak with her to explain you were just trying to make their life better. Don't worry. You won't hear from me. I wanted till the end of feb. You have once again made that impossible. Good bye [R.R.]. Best of luck to you.[46]

---

[44] E.g., Tr. Ex. 2 at 130-132, 161, 171-173.

[45] Id. at 133; see also id. at 137 (Ackell: "If I initiate charges to [Danny], would that clear your mind for the month of feb?" R.R.: "See that is . . . black mail.. And no it wouldn't clear my mind at all. It would make me . . . depressed again. So just stop... please. Why are you so insistent on keeping me around?")

[46] Id. at 189-90.

Ackell argues that, given the confluence of R.R.'s request to end the relationship and Ackell's farewell, a reasonable factfinder <u>must</u> infer that Ackell ended the relationship at R.R.'s request through this text message.  Building on this conclusion, Ackell argues that the undated Kik messages in Exhibit 1 must necessarily precede the text-message conversation and R.R.'s first request to end the relationship.  As such, he concludes, the prosecution has not proven that he acted with the intent to harass or intimidate R.R. when he sent any of the Kik messages.

A jury reasonably could have found, however, that the undated Kik conversation of Exhibit 1 followed, rather than preceded, the January 27-28 text-message conversation of Exhibit 2, as R.R. testified that it did.[47]  First, the final text message from Ackell in Exhibit 2 is not the farewell reproduced above, but rather a February 9, 2014, message encouraging R.R. to check her Kik messages.[48]  This is consistent with R.R.'s testimony that, when she followed this instruction and checked the Kik application on her phone, she found messages from Ackell, including the reproduced Kik conversation.[49]  It is

---

[47] Tr. Trans. Dec. 15 (doc. no. 83) at 100-01.

[48] Id. at 190.

[49] Tr. Trans. Dec. 14 (doc. no. 84) at 129-30; Tr. Trans. Dec. 15 (doc. no. 83) at 111-12.

also consistent with her testimony that the Kik conversation took place during her February vacation from school in 2014.[50]

Second, elements of the Kik conversation may be understood to refer back to the January 27 text-message conversation, supporting the inference that the former followed the latter. For example, through much of the January 27 text-message conversation, R.R. asked Ackell to delete photographs of her and expressed her discomfort with taking more. When Ackell began the Kik conversation by demanding photographs R.R. responded, "And you know im not.gonna take any pictures like I did before, weve talked about it."[51]  R.R. testified that, by this message, she meant that if she "was going to still be, as he said, trapped until a certain date, [she] wanted to take [photographs] that [she] was comfortable with," not respond to his demands to take photographs that she was uncomfortable with.[52]  During the Kik conversation, R.R. then continually requested assurance that Ackell would delete the photographs she was in the process of sending him.  A reasonable factfinder could conclude that her reference to a prior conversation included one in which she

---

[50] Tr. Trans. Dec. 15 (doc. no. 83) at 139–40.

[51] Tr. Ex. 1 at 93 (emphasis added).

[52] Tr. Trans. Dec. 14 (doc. no. 84) at 46.

expressed discomfort with taking pictures like those she had before, such as the January 27 text-message conversation.

As another example, both Ackell and R.R. sent messages during the Kik conversation that can be read to suggest it occurred after Ackell ostensibly "released" R.R. and concluded their communications at the end of their text-message conversation.  Specifically, Ackell sent R.R. a Snapchat message containing a song called "Let her go."  When asked what he meant, he explained: "I let you go... Mistake[.]  I should of kept you forever . . . ."[53]  Similarly, R.R. expressed concern that, though she was no longer "caged," she still felt "trapped," to which Ackell eventually responded, "You are slowly being caged again.  I'm sorry.  You know this."[54]  A reasonable jury could conclude that both Ackell's and R.R.'s references to her having been let go, or being no longer "caged," referred to Ackell's ostensible farewell to R.R. at the end of the text-message conversation.

Third, evidence concerning when R.R. took the screenshots of the Kik conversation also supports this inference.  She testified that she took the screenshots of her Kik conversations on the advice of her father, only after she told him about those

---

[53] Tr. Ex. 1 at 111.

[54] Id. at 100, 103.

conversations and in advance of going to the police in February 2014.[55]  Between Ackell's demand that R.R. call him and his confirmation that he would not trade her (at least, at that time), the screenshot reads:  "Today @ 8:20PM."[56]  A reasonable factfinder could infer from that timestamp that the Kik conversation took place on the day that R.R. took a screenshot of it.  The heading "Dave is typing . . ." which appears at the top of several of the screenshots[57] likewise suggests that R.R. took screenshots of the Kik conversation <u>during</u> that conversation.  In the final captured Kik message, R.R. told Ackell:  "I told my dad everything, including every detail,"[58] from which the jury could conclude that the Kik conversation occurred in the same relative timeframe as R.R. telling her father and, on his advice, taking the screenshots.

A reasonable factfinder could thus conclude that Ackell, having been informed by R.R. that she wished to conclude any relationship they had, ostensibly concluded their relationship on January 28 via text message, but continued to send R.R. text and/or Kik messages designed to injure, harass, or intimidate

---

[55] Tr. Trans. Dec. 14 (doc. no. 84) at 43, 70-71, 130-131.

[56] Tr. Ex. 1 at 99.

[57] Id. at 92-94, 99-100.

[58] Id. at 118.

her into remaining in their relationship -- including sending photographs of herself taken to his specification and upon his demand -- in February 2014.  The jury could similarly conclude that Ackell did this "voluntarily and intelligently, not by ignorance, accident, or mistake, and with the specific intent or purpose of causing a desired result in [R.R.]" because he continued to send such messages even after she informed him that she wished to conclude any consensual relationship they may have had.

### 2.  Causation of substantial emotional distress

Ackell faces, but likewise does not succeed in, a similar uphill battle on the causation element.  In addition to proving intent, the prosecution was required to prove, also beyond a reasonable doubt, that Ackell's course of conduct "cause[d], attempt[ed] to cause, or would be reasonably expected to cause substantial emotional distress" to R.R.  18 U.S.C. § 2261A(2)(B).  Ackell argues that the prosecution failed to do so.  Viewing the evidence in the light most favorable to the jury's verdict, see Santos-Soto, 799 F.3d at 56-57, a reasonable factfinder could conclude that the prosecution has met this burden.

As discussed supra, Part II.A.1, R.R. informed Ackell that she wanted to end their relationship and for him to delete her

photographs at least as of January 27, 2014.  After he declined,
R.R. testified, she "felt [her] only way out of this
relationship was to just kill [herself]."[59]  Her Kik messages to
Ackell corroborate this testimony.  For example, she told
Ackell:  "I'm not mad, I'm more just suicidal, and im mad at
myself. . . . Because even tho im not caged I still feel trapped
and most of all really scared, beyond scared im terrified."[60]
Similarly, Ackell informed R.R. that she was "slowly being caged
again," which prompted R.R. to respond that, if Ackell "caged"
her again, she would "be on suicide watch again."[61]

    R.R. further testified that, because she "thought [her]
only option" to escape the relationship "was suicide, [she] took
[the] opportunity to maybe try to save [herself]" by finding
Ackell "a new girl."[62]  When Ackell proposed "caging" a young
girl, in a manner than "will destroy her," R.R. responded, "I
don't want to have to kill myself over this.  And I want
everything deleted after[.]  I cant deal with the stress and

---

[59] Tr. Trans. Dec. 14 (doc. no. 84) at 51-52.

[60] Tr. Ex. 1 at 102.

[61] Id. at 103-04.

[62] Tr. Trans. Dec. 14 (doc. no. 84) at 55.

anxiety from this and depression I want to find you a new
girl[.]"[63]

Ackell does not dispute R.R.'s characterization of her
emotional state in response to his threats.  He argues, instead,
that other evidence undermines the conclusion that she actually
suffered as drastically as she testified that she did.[64]
Specifically, Ackell points out that:  (1) R.R. never sought
counseling or medical help for her distress; (2) the prosecution
offered no forensic or expert evidence of her distress; (3) the
prosecution did not present corroborating evidence from two
people that R.R. testified she told about her relationship with
Ackell; (4) R.R.'s father noticed no differences in R.R.'s
personality during the relevant period; (5) R.R. told the
Hancock police that she never "felt in danger of being
physically harmed by Ackell,"[65] whom she never did meet in person
and who never appeared at her home or anywhere in her vicinity;
and (6) R.R. never sought a restraining order against Ackell.[66]

---

[63] Tr. Ex. 1 at 112.

[64] Defendant's Consolidated Mem. (doc. no. 79-1) at 10-11.

[65] Tr. Trans. Dec. 15 (doc. no. 83) at 83.

[66] Defendant's Consolidated Mem. (doc. no. 79-1) at 10-11.

Ackell presented these omissions to the jury,[67] which rejected them.

Ackell offers no authority suggesting that a finding of substantial emotional distress requires any of this absent evidence. While the prosecution may have bolstered its case had it introduced evidence as Ackell suggests, a reasonable jury may have found, on the evidence presented, that Ackell's course of conduct caused substantial emotional distress to R.R. As the court instructed the jury:

> "Substantial emotional distress" means mental distress, mental suffering or mental anguish, and includes depression, dejection, shame, humiliation, mortification, shock, indignity, embarrassment, grief, anxiety, worry, fright, disappointment, nausea, and nervousness, as well as physical pain.[68]

R.R. need not have felt in fear of her physical safety to feel depression, shame, humiliation, indignity, embarrassment, anxiety, worry, or fright. She testified that she felt trapped and depressed such that suicide was her only potential route of escape from her relationship with Ackell after he continually refused to delete her photographs and threatened to trade those photographs to another person or disseminate them to her family and friends. Her father testified that, when finally she spoke

---

[67] See Tr. Trans. Dec. 14 (doc. no. 84) at 199-200; Dec. 15 (doc. no. 83) at 82-84, 175-77.

[68] Jury Instructions (doc. no. 72) at 26. The defendant offered no specific objection to this instruction.

to him about Ackell, he perceived that she was "extremely upset" and "really afraid."[69]  A reasonable factfinder could conclude, from the consistent nature of this testimony and R.R.'s contemporaneous Kik and text messages to that effect that Ackell's course of conduct toward her caused her substantial emotional distress.

In addition to arguing that his actions did <u>not</u> cause substantial emotional distress to R.R., he also argues that they could not reasonably be <u>expected</u> to cause substantial emotional distress to R.R. because, during the same time period, R.R. also sent photographs of herself in various stages of dress to a variety of other men.[70]  She also posted provocative photographs to her various social media sites during this time period.[71] Ackell argues that someone who voluntarily conveyed such photographs to others, including those with which she had a limited acquaintance, could not reasonably be expected to suffer substantial emotional distress from threats of having her photographs distributed by Ackell to her family, friends, and social media networks.

---

[69] <u>See</u> Tr. Trans. Dec. 15 (doc. no. 83) at 165.

[70] <u>See</u> Tr. Exs. A, E, G, J, M, N, O, S, CC, FFF, GGG.

[71] <u>See</u> Tr. Exs. FFF, GGG, OOO, PPP.

In determining whether Ackell's course of conduct "would be reasonably expected to cause substantial emotional distress" to R.R., the jury was charged to "consider whether . . . a reasonable person in the same or similar circumstances as R.R. would suffer substantial emotional distress as a result" of Ackell's course of conduct.[72]  As discussed supra, the prosecution presented evidence that R.R. was a teenage girl in an online relationship with a man significantly older, to whom she had sent photographs of herself in varying states of dress, including nude photographs.  The prosecution presented evidence that Ackell threatened, among other things, to:  (1) disseminate those photographs to R.R.'s family and friends; (2) "trade" them, and thus "trade" control over R.R., to another individual; (3) delete the photographs only if R.R. would have sex with him or, in the alternative, procure another girl who would do so; and (4) pursue felony charges against R.R.'s then-boyfriend, Hendrick.  R.R. testified that Ackell followed through with at least one of these threats, sending nude images of R.R. to Hendrick.[73]  A jury may reasonably conclude that such threats would cause a young woman in R.R.'s position to experience

---

[72] Jury Instructions (doc. no. 72) at 27.  The defendant offered no specific objection to this instruction.

[73] Tr. Trans. Dec. 14 (doc. no. 84) at 36-38.

"depression, dejection, shame, humiliation, mortification, shock, indignity, embarrassment, grief, anxiety, worry, fright, disappointment, nausea, [or] nervousness,"[74] while at the same time crediting R.R.'s testimony that she did not feel distressed after sending photographs of herself to other men, who made no such threats.

A reasonable jury could thus find that the prosecution met its burden of demonstrating the intent and harm elements of the crime by a preponderance of the evidence. The court therefore denies Ackell's motion for judgment of acquittal on these grounds.

**B.    Constitutionality of the statute**

Ackell also moves for judgment of acquittal on the grounds that § 2261A(2)(B) is unconstitutional as applied to him and as facially overbroad and unconstitutionally vague. The court previously addressed -- and dismissed -- Ackell's overbreadth and vagueness challenges. See United States v. Ackell, 2016 DNH 185. Ackell's as-applied challenge fails because his course of conduct did not, as he argues, comprise pure speech integral to a dominant/submissive relationship. His facial overbreadth challenge likewise fails because he has not shown that the statute, which criminalizes courses of conduct undertaken with

---

[74] Jury Instructions (doc. no. 72) at 26.

specific intent, criminalizes a substantial amount of protected expressive activity.  Finally, Ackell has waived his undeveloped vagueness challenge.

### 1.  As-applied challenge under the First Amendment

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const., amend. I.  Though, "as a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content," Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002) (quoting Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 65 (1983)), the First Amendment "has permitted restrictions upon the content of speech in a few limited areas . . . including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct . . . ." United States v. Stevens, 559 U.S. 460, 468-69 (2010) (internal quotations and citations omitted). As to the last of these, implicated here, "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." United States v. Sayer, 748 F.3d 425, 433 (1st Cir. 2014) (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)).

Ackell argues that § 2261A(2)(B) is unconstitutional as applied to him. In his case, he contends, the statute impermissibly criminalized a "course of conduct" composed purely of protected speech -- specifically, speech integral to a "consensual fantasy dominant/submissive relationship" in which he and R.R. engaged "until she told him in her own voice that she no longer wanted to communicate with him, around which time the communications ended."[75] Ackell's as-applied challenge fails because his "course of conduct" was not comprised purely of protected speech. Rather, his communications with R.R. were "integral to criminal conduct," which is "recognized as a 'long-established category of unprotected speech.'" Sayer, 748 F.3d at 433-34 (quoting Stevens, 559 U.S. at 471).

The First Circuit Court of Appeals recognized that online communications targeting a specific individual may amount to "conduct" under the 2006 version of the statute. See Sayer, 748 F.3d at 433-34. In upholding the constitutionality of that version of the statute, several other appellate courts further observed that it "proscribe[d] harassing and intimidating conduct" such that "the proscribed acts are tethered to the underlying criminal conduct and not to speech." United States v. Osinger, 753 F.3d 939, 944 (9th Cir. 2014); see also United

---

[75] Defendant's Consolidated Mem. (doc. no. 79-1) at 12.

States v. Petrovic, 701 F.3d 849, 856 (8th Cir. 2012) ("Section 2261A(2)(A) is directed toward 'course[s] of conduct,' not speech, and the conduct it proscribes is not 'necessarily associated with speech.'" (quoting Virginia v. Hicks, 539 U.S. 113, 124 (2003))).

Ackell maintains that his "course of conduct" was, by comparison, a course comprised wholly of speech, without reference to any attendant actions.  On this basis, he distinguishes several cases in which the 2006 version of the statute was found constitutional as applied to defendants who engaged in action in addition to speech.[76]  For example, in Sayer, the defendant physically stalked the alleged victim, induced third parties to call her and visit her home, and posted explicit videos of her online without her permission.  Sayer, 748 F.3d at 428-29.  Similarly, in Petrovic, the defendant accumulated embarrassing information about and photographs of the alleged victim, sent those images to her family, friends, and employer, posted them on a publicly accessible website, and sent packages to her home.  Petrovic, 701 F.3d at 852-53.  In Osinger, the defendant visited the alleged victim's home and place of employment and posted nude pictures of her online as

[76] Defendant's Consolidated Mem. (doc. no. 79-1) at 12-13; Rule 29 Mot. (doc. no. 68) at 4-5.

well as emailing them to her co-workers.  Osinger, 753 F.3d at

941-42.  Finally, in Matusiewicz, the defendant posted

accusations about the alleged victim online, recruited friends

to physically monitor her home, and eventually travelled to her

home state and killed her.  United States v. Matusiewicz, 84 F.

Supp. 3d 363, 365-66 (D. Del. 2015).  Ackell contends that,

unlike these defendants, he did nothing more than speak to R.R.

     While true that Ackell did not visit R.R.'s house, induce

others to do so, or post her photographs to a website, his

course of conduct is not, as he portrays it, "pure speech."

Here, a reasonable factfinder could conclude from the evidence

presented that Ackell acted by storing R.R.'s compromising

photographs while representing to her that they had been, or

would be, deleted.  When R.R. asked Ackell to delete those

photographs and cease communication with her, Ackell used the

threat of their continued existence -- including the explicit

threat that he would "trade" her to another man, who would hold

those photographs over her head, or that he would expose the

photographs to R.R.'s family and friends -- to induce R.R. to

send him more such photographs, despite her expressed discomfort

and disinclination to do so.  R.R. testified that Ackell

actually acted on one of his threats when he sent nude

photographs to her boyfriend.[77]  As such, the court cannot
conclude, as Ackell would have it do, that Ackell "is being
prosecuted <u>only</u> because of his speech."[78]  To the contrary, the
evidence demonstrates that Ackell engaged in a course of conduct
not solely limited to -- but rather effected through -- his
communications with R.R.

Even had Ackell's conduct amounted to pure speech, that
speech was not protected.  Ackell contends that all of his
communications with R.R. occurred in the context of a consensual
dominant/submissive relationship, and thus were protected.[79]  <u>See</u>
<u>United States v. Baker, 890 F. Supp. 1375, 1385-88 & n.17 (E.D.</u>
<u>Mich. 1995)</u> (sexually explicit communications between two
private individuals protected by the First Amendment).  As
discussed <u>supra</u> Part II.A.1, however, a rational factfinder
could conclude that Ackell sent messages to R.R., with the
intent to harass or intimidate her into continuing to sending
him compromising photographs through the end of February, 2014,
after she clearly expressed her desire to exit any such
relationship at the end of January 2014.  As such, "to the
extent that his course of conduct targeting [R.R.] involved

---

[77] Tr. Trans. Dec. 14 (doc. no. 84) at 36-38.

[78] Rule 29 Mot. (doc. no. 68) at 5.

[79] Defendant's Consolidated Mem. (doc. no. 79-1) at 12-13; Rule
29 Mot. (doc. no. 68) at 6-7.

speech at all, his speech is not protected" insofar as "it served only to implement [his] criminal purpose." Sayer, 748 F.3d at 434.

Ackell's continued reliance on United States v. Cassidy, 814 F. Supp. 2d 574 (D. Md. 2011), remains misplaced. The court in Cassidy found the 2006 version of the statute unconstitutional under the First Amendment as applied to a defendant who posted threats and other potentially emotionally distressing speech aimed at a public figure -- a religious leader -- to Twitter and his blog. 814 F. Supp. 2d at 581-87. This situation is far removed from that unconstitutional application. R.R. is not a public figure, as the victim was in Cassidy. Id. at 583. Nor could his communications with her be characterized as speech that "touches on matters of political, religious or public concern." Id. at 582. Finally, Ackell's communications with R.R. were private, like a telephone conversation, not public, like Twitter or blog postings, which could more readily be avoided.[80] Id. at 576-77.

---

[80] Private messages are less like the public sign to which the Cassidy court compared that defendant's public communications, id. at 577-78, and more akin to communications over the telephone -- that is, communications directed at a single individual, from which one cannot so simply avert one's eyes. Ackell's suggestion that R.R. revise her privacy settings, block Ackell from her social media accounts, and ignore his text messages, see Rule 29 Mot. (doc. no. 68) at 8-9, is nearer to suggesting that a stalking victim could avoid her assailant by staying indoors, locking her front door, and only opening it to

Ackell's communications with R.R. were integral to a course of criminal conduct and, therefore, unprotected insofar as they were part and parcel of his "extortionate threats to harass and intimidate [R.R] if she terminated their . . . relationship." Sayer, 748 F.3d at 434.  Because § 2261A(2)(B) has thus been constitutionally applied to Ackell, the court need not -- and therefore does not -- engage the analysis of whether the statute amounts to a permissible restriction on protected speech.

## 2.  Facial overbreadth challenge

In addition to arguing that § 2261A(2)(B) is unconstitutional as applied to him, Ackell also challenges it as overbroad on its face.[81]  "The first step in overbreadth analysis is to construe the challenged statute," and the second is to determine "whether the statute, as [the court has] construed it, criminalizes a substantial amount of protected expressive activity."  United States v. Williams, 553 U.S. 285, 293, 297 (2008).  Engaging this two-step analysis, the court rejected

---

people she knew, than to the court's billboard analogy in Cassidy.

[81] Ackell may bring such a challenge to the facial validity of the statute despite its constitutional application to him because of its First Amendment implications.  See Hicks, 539 U.S. at 118 ("The First Amendment doctrine of overbreadth is an exception to our normal rule regarding the standards for facial challenges.").

Ackell's prior facial challenge in its order denying his motion to dismiss the indictment.  See Ackell, 2016 DNH 185, 9-20.

As the court there observed, the First Circuit Court of Appeals upheld the constitutionality of the 2006 version of the statute against a similar facial challenge.  Id. at 2-3 (citing Sayer, 748 F.3d at 434-36).  Congress amended the statute in 2013 in two ways material to Ackell's arguments:  it added the intent to "intimidate" to the intent requirement and changed the requirement that the defendant "engage in a course of conduct that causes substantial emotional distress" to the present requirement that the defendant "engage in a course of conduct that . . . causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress" to the victim. See id.  The court concluded that these additions did not unconstitutionally expand the scope of the statute because Ackell had not demonstrated that "a substantial number" of the applications of the statute, as amended, were "unconstitutional, judged in relation to the statute's plainly legitimate sweep."[82]

_____

[82] Citing McCullen v. Coakley, 134 S. Ct. 2518, 2537-40 (2014), Ackell now asserts that "the burden in justifying the law's facial constitutionality under the First Amendment falls on the United States, not the Defendant."  Rule 29 Mem. (doc. no. 68) at 15.  This is true in the context of challenges to content-neutral restrictions on speech in traditional public fora, such as those levelled in McCullen, 134 S. Ct. 2537-40 (2014) and Cutting v. City of Portland, 802 F.3d 79, 91 (1st Cir. 2015). In those cases, the government must "meet the requirement of narrow tailoring" by demonstrating "that alternative measures

Id. at 13 (quoting Stevens, 559 U.S. at 473).  Specifically, as
the First Circuit Court of Appeals did in Sayer, this court
concluded that Ackell's reliance on Cassidy and his "smattering
of hypotheticals" failed to "satisfy the standard for
invalidating a statute as facially overbroad."  Ackell, 2016 DNH
185, 19; see also Sayer, 748 F.3d at 435-36 (rejecting
defendant's facial challenge that relied on Cassidy and
hypothetically overbroad applications).

     Ackell takes no issue with the court's construction of the
statute.  Nor does he dispute the court's approach to its
review.  Instead, seeking only to remedy the deficiency noted
above, Ackell offers a new series of examples of protected
speech or activity that, he argues, the statute
unconstitutionally criminalizes.  Very few of those examples,
however, fall into the intersection of constitutionally-
protected speech that also amounts to a course of conduct
criminalized by § 2261A(2)(B).

---

that burden substantially less speech would fail to achieve the
government's interests . . ."  McCullen, 134 S. Ct. at 2540
(emphasis added).

But in this context, where a defendant challenges the facial
overbreadth of a criminal statute, he "bears the burden of
showing 'from the text of [the law] and from actual fact, that
substantial overbreadth exists.'"  Sayer, 748 F.3d at 435
(quoting Hicks, 539 U.S. at 122).  Here, Ackell challenges the
statute as overbroad; he thus bears the burden of demonstrating
it is so.

Some of the speech that Ackell invokes falls outside the ambit of the First Amendment.  For example, threats against Ackell's life and safety made by R.R.'s boyfriend, Hendrick, if made with the requisite intent, may well amount to a course of conduct prohibited by § 2261A(2)(B); but not even Ackell argues that threats against his life are constitutionally protected.[83] See United States v. Walker, 665 F.3d 212, 227 (1st Cir. 2011) ("The law is crystal clear that threats are not constitutionally protected speech.").  Death threats or threats of violence sent to electors following the 2016 presidential election or against a professor of atmospheric science fall into the same category.[84]

Other examples of speech invoked by Ackell, though protected, do not likely amount to a course of conduct prohibited by § 2261A(2)(B).  The intent and "course of conduct" requirements aim the statute toward "conduct performed with serious criminal intent, not just speech that happens to cause annoyance or insult."  Sayer, 748 F.3d at 435.  Speech calling a female bodybuilder "gross" or a "fat cow," asking electors to change their votes (albeit in some volume), and questioning climate scientists[85] may fall into the latter category, but is

---

[83] Defendant's Consolidated Mem. (doc. no. 79-1) at 14.

[84] Defendant's Consolidated Mem. (doc. no. 79-1) at 15-17.

[85] Defendant's Consolidated Mem. (doc. no. 79-1) at 15-17.

unlikely to fall into the former.  Indeed, if any intent criminalized by the statute attaches to such statements, it would be the intent to harass; but the Court of Appeals upheld the 2006 version of the statute, which included "the intent to . . . harass," Sayer, 748 F.3d at 435-36, against such a facial challenge as this.  This court, therefore, cannot conclude that the statute's potential to encompass speech made with intent to harass renders the statute unconstitutional.

Finally, the defendant invokes the effect of statements made via Twitter in December 2016 by the then-President-Elect criticizing private individuals.[86]  These statements, which the defendant suggests may have been made with the intent to harass or intimidate, and may reasonably be expected to cause emotional distress in the victim, amount to protected political speech criminalized by the statute.[87]  The defendant does not suggest, however, that the emotional distress stems from the President-Elect's statements; rather, he suggests that any emotional distress was caused by harassing and threatening telephone calls, emails, and other communications from other individuals inspired by those Twitter statements.[88]  As such, the statements

---

[86] Rule 29 Mot. (doc. no. 68) at 15-18.

[87] Id.

[88] Id. at 16 ("Mr. Trump's Tweets caused a number of his followers to threaten Mr. Jones and engage in harassing phone

themselves are unlikely to fall within the statute's ambit.
Even if they did, two examples "are insufficient to demonstrate
that § 2261A(2) 'is substantially overbroad, either in an
absolute sense or relative to its legitimate applications, so as
to warrant the 'strong medicine' of invalidating the entire
provision.'" Ackell, 2016 DNH 185, 19 (quoting Sayer, 748 F.3d
at 435-46).

### 3. Vagueness challenge

Finally, Ackell renews his challenge to the
constitutionality of § 2261A(2)(B) as unduly vague. The court
rejected his prior argument that § 2261A(2)(B) is
unconstitutionally vague on its face because he had not, at the
time, also contended that § 2261A(2)(B) was unconstitutionally
vague as applied to his conduct. Ackell, 2016 DNH 185, 20-21
("Ackell's facial overbreadth challenge can proceed despite the
absence of an as-applied challenge because of its relation to
the First Amendment. The law recognizes no such exception for a

---

calls to him at his home and to two secretaries answering phones
at the local union headquarters. And while Mr. Jones appears to
be uncowed by Mr. Trump's Tweets, the article says nothing of
the secretaries . . . ."); id. at 17 ("Mr. Trump fired off two
Tweets targeting the young woman that caused his followers to
begin contacting her by phone, Facebook, and email to leave
threatening messages, often sexual in nature, which, in turn,
caused the young woman to flee to her home and hide.").

vagueness challenge.") (citing [Holder v. Humanitarian Law Project, 561 U.S. 1, 19 (2010)](#)).

Ackell's renewed motion to dismiss the case on vagueness grounds suffers from the same malady.[89]  Absent anything more than a bald assertion that the statute is vague, with citation to his recitation of the trial evidence and prior motions in which he advanced no as-applied vagueness argument, the court has no basis to evaluate the merits of his as-applied vagueness challenge.  Accordingly, "[t]his claim is waived" because Ackell "merely repeats his overbreadth argument and does not develop a separate and distinct argument under the vagueness doctrine." [Sayer, 748 F.3d at 436](#) (citing [United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)](#); [Holder, 561 U.S. at 20](#)).

### III. **Motion for new trial**

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." [Fed. R. Crim. P. 33(a)](#).  Ackell contends that the interest of justice requires that he be afforded a new trial, first, because he was denied the public trial to which the Sixth Amendment entitles him and, second, because the weight of the evidence preponderates heavily against the jury's guilty

---

[89] Defendant's Consolidated Mem. (doc. no. [79-1](#)) at 18-19.

verdict.  Unpersuaded on either point, the court denies Ackell's
motion for a new trial.

## A.  Public trial

"In all criminal prosecutions, the accused shall enjoy the
right to a speedy and public trial, by an impartial jury of the
State and district wherein the crime shall have been committed .
. . ."[90]  U.S. Const. amend. VI.  The guarantee of a public trial
benefits the defendant; a trial is more likely to be fair when
the public may be present.  See United States v. Candelario-
Santana, 834 F.3d 8, 22 (1st Cir. 2016) cert. denied, 137 S. Ct.
1112 (2017).  Accordingly, trial closures are to be "rare and
only for cause shown that outweighs the value of openness," and
must be justified by "an overriding interest based on findings
that closure is essential to preserve higher values and is
narrowly tailored to serve that interest."  Press-Enterprise Co.
v. Superior Court, 464 U.S. 501, 509-10 (1984) (internal
quotations omitted).  Where, as here, the defendant objects to
the closure "at trial . . .  the defendant generally is entitled

---

[90] Ackell invokes his right to a public trial under both the
First and Sixth Amendments.  See Defendant's Mem. (doc. no. 79-
1) at 21.  "The Sixth Amendment right . . . is the right of the
accused," whereas the First Amendment protects the right of the
public to be present at criminal trials.  Presley v. Georgia,
558 U.S. 209, 212 (2010).  Because the accused asserts the
public trial right in this case, the court performs its analysis
under the Sixth Amendment.

to" a new trial "regardless of the error's actual 'effect on the outcome'" of the trial.  Weaver v. Massachusetts, No. 16-240, 2017 WL 2674153, at *10 (U.S. June 22, 2017) (internal quotations omitted).  Here, there has been no violation of Ackell's right to a public trial, and thus he is not entitled to a new one, because he has not demonstrated that the court was, in fact, closed.

The victim in this case, R.R., was slated to continue her testimony on the morning of the third day of trial.  Before court convened that morning, a teacher from Concord High School brought her class into the courtroom's gallery.  At the prosecution's request, the court held a chambers conference with all counsel and the teacher present.  During that conference, the court explained the subject matter of the victim's anticipated testimony -- and, in particular, the graphic nature thereof -- to the teacher, who responded that she and her students would nevertheless attend the trial.  The court rejected the prosecution's request that the United States Attorney's Victim Witness Advocate address the students on proper courtroom behavior, and informed counsel that it would address the students itself.

After the teacher left chambers, the court conducted a conference on jury instructions with counsel.  After that conference, the teacher informed the court that, upon

reflection, her class would observe a suppression hearing taking place in another courtroom instead of attending the trial. She then removed her students from the courtroom.

Ackell contends that the teacher removed the students from the courtroom because of inappropriate interference on the part of the Victim Witness Advocate who, defense counsel represented to the court, spoke with the teacher outside of the courtroom.[91] The court then held a second conference with counsel and the teacher present. At that second conference, the court informed the teacher as follows:

> What I wanted to make sure everyone understood . . .
> is that you and your class are welcome in this
> courtroom. You have every right to be here and the
> defendant has a right under the Sixth Amendment of the
> United States Constitution to a public trial, and that
> includes attendance by your class should you wish to
> be here and should you wish – that's your decision, I
> think, ultimately. They're here under your
> supervision. But the fact is, it's very important to
> the Court that you understand that neither the Court
> nor any part of the government has any desire or wish
> that you or your students be excluded from the
> courtroom. They're welcome here. You are welcome
> here. There are no barriers whatsoever to your
> attendance at this proceeding as far as the Court's
> concerned. . . . .
>
> [T]he bottom line is the courtroom doors are open.
> You don't have to advise the Court of any decision you
> make. What you are free to do is enter and be seated
> and participate as spectators. What the Court had
> envisioned doing, by the way, when it addressed the
> students was to explain to them only that, I think it
> was at the suggestion of counsel, I think it's a good

---

[91] Defendant's Mem. (doc. no. 79-1) at 23-24.

approach, that this is a federal criminal trial, it's serious business, and they should conduct themselves with respect for the proceeding and any witnesses on the stand. The witness on the stand this morning was going to be the victim, the alleged victim in the case, but what the Court was going to address them about was the nature of the proceeding, the sensitivity of some of the subject matter and the way they should comport themselves while sitting in the gallery of the trial. That's as far as the Court was going to go and I think that's what we discussed.[92]

The court then confirmed that the teacher understood that she and her class had a right to be present at the trial:

THE COURT: [W]hat the Court does want to make sure . . . is that you understand that not only from the Court's perspective that the defense has a Sixth Amendment right to a public trial, but that you and your class have a right to be present at the trial. You understand?

[TEACHER]: Yes.

THE COURT: All right. And as far as -- so your understanding, are there any barriers to you and your [class] entering this courtroom today if you want to watch the trial?

[TEACHER]: None.[93]

Counsel then returned to the courtroom, the jury was assembled in the courtroom, and court convened. The teacher and her class did not return to the courtroom.

In determining whether a defendant has been denied a right to a public trial, the court "must first determine whether . . .

---

[92] Tr. Trans. Dec. 15 (doc. no. 83) at 5-6 (emphasis added).

[93] Id. at 8.

there was, in fact, a courtroom closure." United States v. Negrón-Sostre, 790 F.3d 295, 301 (1st Cir. 2015).  The essential element of that inquiry is whether "the public was barred." Id. at 304.

An improper courtroom closure can be total or partial.  A "total closure" occurs "where all members of the public are excluded during some portion of the trial." United States v. Laureano-Pérez, 797 F.3d 45, 77 (1st Cir. 2015), cert. denied sub nom. Cummings-Ávila v. United States, 136 S. Ct. 915 (2016). The defendant does not argue that a "total closure" occurred here.  Nor could such an argument prevail; the doors to the courtroom remained open to members of the public throughout the proceedings.

Ackell contends, instead, that the Victim Witness Advocate's communication with the teacher, and the teacher's subsequent removal of her class from the courtroom, amounts to "at least a partial closure,"[94] which occurs when "courtroom access is restricted but some members of the public are permitted to attend." Laureano-Pérez, 797 F.3d at 77.  A partial closures occurs, for example, when the defendant's family are "removed from the courtroom and forbidden from returning on that day" because "the courtroom was closed to them

---

[94] Defendant's Mem. (doc. no. 79-1) at 24.

. . . ." Id. at 77 n.28.  A partial closure also occurs when
the court "screen[s] and record[s] the identification of all
would-be trial spectators," because that procedure "(1) barred
only those would-be spectators who opted not to submit written
identification, and (2) presumably may have 'chilled' attendance
by some potential spectators who opted not to present themselves
at the courthouse."  United States v. DeLuca, 137 F.3d 24, 30,
33-34 (1st Cir. 1998).

        No partial closure occurred here.  Even assuming that the
Victim Witness Advocate asked the teacher to remove her students
from the courtroom, the court rectified any potential for
exclusion by confirming, on the record, the teacher's
understanding that she and her students had "a right to be
present at the trial" and that there were not "any barriers" to
her and her students entering the courtroom if they wanted to
watch the trial.[95]  To the contrary, the court indicated -- and
the teacher understood -- that the class was not only permitted,
but welcome to return to the courtroom.  The court confirmed
this understanding before any public court proceedings began on
that day of trial -- that is, court did not convene at any time
between the Victim Witness Advocate's alleged contact with the
teacher and the court's confirmation of the latter's

---

[95] Tr. Trans. Dec. 15 (doc no. 83) at 8.

understanding that the proceedings were open to her and her students.  Thus, even if the Victim Witness Advocate's alleged contact with the teacher acted to close the courtroom, the court reopened it after the defendant objected and before any proceedings occurred.  See Weaver, 2017 WL 2674153, at *12 ("[W]hen a defendant objects to a courtroom closure, the trial court can either order the courtroom opened or explain the reasons for keeping it closed.").

Accordingly, because no member of the public was excluded from the proceedings, the court was not closed -- either completely or partially -- at any time during Ackell's trial, and his right to a public trial was not violated.  The court therefore denies his motion for a new trial on this basis.

**B.  Weight of the evidence**

In addition to invoking the Sixth Amendment, Ackell seeks a new trial on the grounds that the weight of the evidence was against the jury's guilty verdict.[96]  Such motions are "directed to the broad discretion of the trial judge, who may weigh the evidence and evaluate the credibility of witnesses in considering such a motion."  United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001) (quoting United States v. Indelicato, 611 F.2d 376, 387 (1st Cir. 1979)).  This remedy is

_____

[96] Defendant's Consolidated Mem. (doc. no. 79-1) at 19-20.

to be "sparingly used, and then only where there would be a 'miscarriage of justice . . . and where the evidence preponderates heavily against the verdict.'" Wilkerson, 251 F.3d at 278 (quoting United States v. Leach, 427 F.2d 1107, 1111 (1st Cir. 1970)). "Because the district court must generally defer to a jury's credibility assessments, '[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" United States v. Merlino, 592 F.3d 22, 32–33 (1st Cir. 2010) (internal quotations and citations omitted).

This case does not present such exceptional circumstances. As discussed <u>supra</u> Part II.A, the evidence supports the jury's verdict. That is, a reasonable factfinder could conclude from the evidence that Ackell engaged in a course of conduct with the intent to harass or intimidate R.R., and that R.R. suffered substantial emotional distress, or would reasonably be expected to suffer substantial emotional distress, as a result of Ackell's actions. Because the evidence does not preponderate heavily against the jury's verdict, the court denies Ackell's motion for a new trial on these grounds.

IV.  **Conclusion**

For the reasons discussed above, the court DENIES the defendant's motions for judgment of acquittal[97] and a new trial.[98]

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge


Dated:    July 7, 2017

cc:  William E. Christie, Esq.
     Suzanne Amy Spencer, Esq.
     Helen W. Fitzgibbon, AUSA
     Robert M. Kinsella, AUSA
     Donald A. Feith, AUSA

---

[97] Document nos. 68, 79.

[98] Document no. 80.